# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

NATHAN GILLIS,

        Plaintiff,

v.                                                              Case No. 02-C-463

JON LITSCHER, et al.,

        Defendants.

## DECISION AND ORDER

        This case arises under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the Constitution. In particular, plaintiff Nathan Gillis, claims that he was subjected to cruel and unusual punishment when he was placed in a Behavioral Modification Program ("BMP") for twelve days beginning March 1, 2002 while he was incarcerated at the Wisconsin Secure Program Facility. He also claims that the placement violated his right to due process under the Fourteenth Amendment because no hearing was held prior to his placement in the BMP.

        In my March 31, 2005 decision and order ("March 31 Order"), I denied summary judgment on the Eighth Amendment claim on the basis that there were still outstanding issues of material fact. In particular, I asked: "Was the plaintiff naked pacing in his cell to keep warm for several days, with only a concrete slab to sleep on? Exactly what hygiene items did the plaintiff receive during this time and when did he receive them?" (March 31 Order at 25.) I also denied summary judgment on the due process claim, given the unanswered questions about the nature of Gillis' confinement. Soon after issuing that order, I appointed counsel for the plaintiff and scheduled briefing and

discovery on these claims. The claims are now fully briefed and the facts are more developed. For the reasons given below, the defendants' motion for summary judgment is granted and the plaintiff's motion is denied.

**I. ANALYSIS**

A detailed statement of facts can be found in the March 31 Order. The issues most pertinent to the present Eighth Amendment and Due Process claims involve the nature of the conditions Gillis experienced while on the BMP. According to the defendants:

> Gillis' BMP was activated for 12 days from March 1 until March 13, 2002. (DFOF ¶¶ 81,123). For the first five days, from March 1 until March 6, 2002, Gillis remained on Stage One of the BMP. He was naked in a cell without any property and he received nutri-loaf for his meals. (DFOF ¶¶ 65, 81, 104-105, 115). For seven days, from March 6 until March 13, 2002, Gillis was on Stage Two of the BMP. (DFOF ¶¶ 115, 123). Under the terms of the BMP, Gillis had a segregation smock, regular meals, hygiene items, and showers. (DFOF ¶ 66; see Govier Aff., Exhs. A3-4 (photos of segregation smock)). The temperature in Gillis' cell at all times during this period remained above 70 degrees Fahrenheit. (DFOF ¶ 125).

In addition, during the entirety of the BMP, the plaintiff was given toilet paper upon request. It also appears that by March 6 he had a bed in his cell and was no longer forced to lie on the floor. (Hompe Aff., Ex. 108.)

The plaintiff does not dispute any of the above facts. Instead, the plaintiff simply characterizes the facts differently. While essentially conceding that the cell was more than 70 degrees, for example, the plaintiff nevertheless claims that it was unbearably cold, especially given the fact that Gillis was completely naked for the first five days, after which he was given a smock that covered him from neck to groin.[1] The plaintiff also notes that the BMP occurred during early

---

[1] Although a seemingly minor point, I believe it noteworthy that the defendants' facts indicate the temperature was "above 70 degrees," a statement from which a reasonable inference is that the temperature was 71 or higher. The plaintiff does not explicitly disagree with this claim, although

2

March, when the outside temperature was still wintry. (Although he does not explain how that is relevant, given the inside temperature of at least 71.) The prison's records indicate that Gillis complained it was too cold in his cell and that he requested a blanket. (Hompe Aff., Ex. 108.)

**1. Due Process**

In short, the plaintiff's due process claim is that when he was placed on the BMP without first having a hearing, he was deprived of liberty without due process of law. Because it is undisputed that Gillis did not receive due process (i.e., notice and a hearing), both parties zero-in on the core issue of whether a hearing was actually required. As previously discussed in the March 31 Order, the Supreme Court has held that, within the prison context, inmates generally possess no liberty interests in maintaining a particular level, or type, of incarceration. For instance, a prison generally need not hold a hearing before moving an inmate from its general prison population to segregation. *Higgason v. Farley,* 83 F.3d 807, 809-10 (7th Cir. 1996) (noting that a prisoner's placement in segregation did not implicate liberty interest). Yet there are occasions when the change in custody is so drastic that an inmate's liberty interest would be violated if the change occurred without notice and an opportunity to be heard. Such a deprivation occurs when the prison–and here is the key phrase–"imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). Any

---

he portrays the temperature as being "at most 70 degrees." (Pltf. Brief in Opp. at 9.) There does not seem to be any factual basis for the plaintiff's shading of the evidence, however. Indeed, the prison's temperature records indicate that the temperature was set at 72, and that the actual temperatures in the units were in the mid-70s. (Hompe Aff., Ex. 109.) Given that these cases sometimes turn on slight details, and given that a few degrees either way can dramatically change one's level of discomfort, the point is at least worth mentioning.

3

condition imposing a lesser restraint on a prisoner's freedom falls "within the expected perimeters of the sentence imposed by a court of law." *Id.*

The state admits that the BMP was atypical, but disputes the notion that the hardship it imposed was "significant." The plaintiff proposes that the various restrictions and hardships placed on him should be amalgamated, and that the significance of the deprivations will be discernible through this *gestalt* approach. That is, while any one of the particular hardships could be dismissed as insignificant, the combination of them shows how spartan Gillis' conditions truly were. In particular, the fact that Gillis was naked or only given a smock, that he had to sleep on the cell floor for part of the period, that he was cold, and that he was deprived of personal hygiene items all show that his confinement presented a significant hardship in relation to ordinary prison life. *See Wilkinson v. Austin,* 125 S. Ct. 2384, 2395 (2005) ("While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context.")

Nevertheless, several factors support the state's view that the BHP imposed on Gillis did not amount to a significant hardship, at least for due process purposes. Most important, in my view, is the brief duration of the BHP. "The length of disciplinary confinement is one of the guiding factors in applying *Sandin's* 'atypical and significant hardship' test." *Hanrahan v. Doling,* 331 F.3d 93, 97-98 (2d Cir. 2003). Thus, "where the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest." *Id.* Here, the most severe restrictions Gillis complains about occurred during stage one of the BMP and involved the plaintiff's lack of clothing and any other items, including personal hygiene items like toothpaste; as I noted in the March 31 Order, the plaintiff was

4

essentially placed naked into an equally naked cell. But these conditions, which are undeniably harsh, lasted for only five days, and three of those days were due to the plaintiff's continued misbehavior during the initial stages of the BMP. In Deputy Warden Hompe's words, stage one of the BMP essentially started over after two days due to Gillis' smearing of blood and feces around his cell and his refusal to clean it up. (Hompe Aff., ¶ 62.) Given this fact, the five day period of time appears even more reasonable. After that period, the plaintiff received clothing, bedding, hygiene items and showers, and thus the conditions of his confinement during stage two of the BMP were therefore relatively insignificant compared to the ordinary incidents of prison life.

The importance of the brevity of the deprivations bears underscoring because it speaks to both the objective harshness of the inmate's environment and also sounds in the general concerns of the Due Process Clause itself. On the first point, had Gillis' stage one BMP conditions lasted months (or perhaps even weeks), I have no doubt that they would constitute a significant and trenchant hardship. The conditions would also likely constitute cruel and unusual punishment. But when such conditions last only briefly, their harshness is mitigated: what is endurable for one week might not be endurable for one month or one year, and courts recognize that the specific conditions of confinement are to be analyzed with respect to the length that they are endured. "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999) (citation omitted).[2]

---

[2]Perhaps recognizing that the brevity of the BMP is his case's Achilles' heal, the plaintiff suggests that the confinement *could* have lasted much longer than it did, and we should therefore focus on what the potential deprivation could have been. (*See* March 31, 2005 Order at 11.) But even if true that is of little moment. The most severe restrictions (no clothing or hygiene items) ended after five days, and the entire BMP was suspended after eleven. When determining whether

5

Clearly, being naked in a bare cell is more of a hardship than the conditions experienced by the comparison group of inmates–those in segregation at the WPSF–whose confinement serves as a benchmark for what constitutes the "ordinary incidents of prison life." *Sandin,* 515 U.S. at 484; *Lekas v. Briley*, 405 F.3d 602, 609 (7th Cir. 2005) . But it is doubtful that the differences in Gillis' confinement–lack of clothes and other personal property, for instance–created such "especially harsh conditions" that a mere five days of enduring them would be adequately significant to constitute a deprivation of a liberty interest. *Sealey,* 197 F.3d at 586. It is understandable that Gillis was cold and otherwise uncomfortable, but given the temperatures in the 70's his case does not even begin to approach the kinds of abuses found in other cases.

Of course federal judges are not armchair Benthamites, and we are not called upon in these cases to divine, based on some utilitarian calculus, whether a relatively brief, yet harsh, confinement approximates the deprivations attendant upon a longer, less harsh confinement. Yet I am persuaded that the brevity of Gillis' confinement here determines the outcome: as the Seventh Circuit has noted, "courts place a premium on the duration of the deprivation." *Stephens v. Cottey*, 145 Fed. Appx. 179, 181 (7th Cir. 2005)(citing *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir.1998)). And when courts routinely find that much longer disciplinary segregations–100 days, 6 months, etc.,–are not significant hardships, it seems reasonable to conclude that Gillis' exceptionally brief confinement

---

a liberty interest was affected, we must look at the *actual* deprivation rather than what could theoretically have occurred. See *Colon v Howard,* 215 F.3d 227, 231 n.4 (noting that the SHU "confinement actually served" may be the "appropriate focus" in determining whether an inmate has alleged a due process violation under *Sandin.*) The distinction does have some weight in the qualified immunity inquiry, because that involves the mental state of officials at the time they imposed the confinement.

6

Case 1:02-cv-00463-WCG   Filed 03/13/06   Page 6 of 12   Document 275

should be similarly categorized.³ That is, while undoubtedly more severe than the ordinary incidents of prison life, the severity of the conditions was not of such a degree that it outweighs the relatively brief period Gillis had to endure them. In fact, one would expect that some, or most, inmates would prefer a week of stage one BMP to six months of disciplinary segregation.

An example of the contrary is found in *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir. 2004), a case in which the plaintiff alleged, as here, that his conditions were harsher even than the typical disciplinary segregation:

> Ortiz alleges that for at least part of his confinement, he was kept in SHU for twenty-four hours a day, was not permitted an hour of daily exercise, and was prevented from showering "for weeks at a time." Based on these and Ortiz's other allegations relating to his treatment in SHU, we think that, if proved, they could establish conditions in SHU "far inferior" to those prevailing in the prison in general. We thus conclude that Ortiz has alleged that the ninety-day SHU sentence imposed on him was, under the circumstances, a hardship sufficiently "atypical and significant" to withstand a Rule 12(b)(6) motion as to the first part of the due process test.

*Id.* (citations omitted). There, of course, while the conditions are similar to Gillis', the most glaring aspect of the confinement is that it lasted for 90 days, eighteen-times longer than Gillis' stage one confinement. Similarly, a briefer period (two months) of confinement was addressed by the Ninth Circuit, but in that case the conditions were far harsher than those faced by Gillis:

> Serrano wallowed in a non-handicapped-accessible SHU for nearly two months . . . During his time in the facility, Serrano was denied use of his wheelchair, which he was permitted to use in the general population. Serrano has alleged that he could not take a proper shower; that he could not use the toilet without hoisting himself up by

---

³That the deprivation here was relatively minor is also made clear when one considers that free citizens may be arrested and held for two days before there must be a hearing: the Supreme Court has ruled that the Fourth Amendment required arrested persons to be afforded "promptly" a determination of probable cause, *see Gerstein v. Pugh,* 420 U.S. 103, 125 (1975), and the Court adopted 48 hours as a time period that "will, as a general matter, comply with the promptness requirement of *Gerstein.*" *County of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991).

7

the seat; that he had to crawl into bed by his arms; that he could not partake in outdoor exercise in the yard; and that he was forced to drag himself around a vermin and cockroach-infested floor.

*Serrano v. Francis,* 345 F.3d 1071, 1078 (9th Cir. 2003). Cases like this are not dispositive because my inquiry is fact-based and particularized to the case before me. But they do demonstrate the nature and duration of the conditions that have been found sufficient to implicate due process and the contrast with Gillis' case is instructive.

In addition to mitigating the objective harshness of the confinement, an additional impact of the brevity of Gillis' BMP is that it differentiates Gillis' confinement from the sorts of status-changing confinements at issue in most other due process cases. In *Wilkinson,* for instance, the Supreme Court was obviously concerned about the fact that an inmate's placement in a Supermax facility was indefinite–"[u]nlike the 30-day placement in *Sandin,* placement at [Supermax] is indefinite and, after an initial 30-day review, is reviewed just annually." 125 S. Ct. at 2394-95. It is these more lengthy confinements that work to alter the very nature, or status, of the inmate's confinement much more than do brief ones: in the Supreme Court's words, they "work a major disruption in his environment." *Sandin*, 515 U.S. at 486; *Lekas v. Briley,* 405 F.3d at 612 ("But while Lekas's 90 day segregation was longer than the 19 day confinement in Williams and even the 70 day segregation in Thomas, it was still not so long as to work an atypical and significant hardship.")

A final point. In my view, when the inmate knows that his own good behavior will alleviate his conditions in short order, such conditions, while undeniably harsh, can have a proper coercive effect. In particular, when the "keys to the cell" are to some extent in the inmate's own hands, a brief period of deprivation like the one Gillis experienced is not the sort of deprivation for which

8

a prior hearing would serve any meaningful purpose. Seen in that light, it might be that the claim sounds not so much in due process as it does in other protections granted in the Constitution. After all, my conclusion that an inmate's confinement does not effect a significant hardship justifying due process is not the same as concluding the inmate has no recourse at all–it simply means a hearing was not warranted in advance of the defendants' actions. As the Supreme Court pointed out in *Sandin,* "[p]risoners . . . retain other protection from arbitrary state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment where appropriate, and may draw upon internal prison grievance procedures and state judicial review where available." 515 U.S. at 487 n.11.

In conclusion, I find that the BMP imposed on Gillis did not significantly disrupt his prison environment and did not impose a substantial hardship on him such that a pre-punishment hearing was required. Accordingly, the plaintiff's motion for partial summary judgment is denied and the defendants' motion is granted as to the due process claim.

**2. Eighth Amendment**

The plaintiff also claims his confinement in the BMP constituted cruel and unusual punishment in violation of the Eighth Amendment. Because I have found that Gillis' confinement did not effect a major disruption in his environment or impose an atypical and significant hardship upon him, it might plausibly follow that he could make no case for cruel and unusual punishment. Indeed, some courts have assumed as much. *See, e.g., Argue v. Hofmeyer,* 80 Fed.Appx. 427, 429 (6th Cir. 2003)("We also conclude that Argue has not stated an Eighth Amendment claim concerning his twenty-three hour per day confinement to his cell . . . because the confinement does not impose an atypical and significant hardship.")

9

But that approach overlooks the different purposes served by the Due Process Clause and the Eighth Amendment. Whereas the Eighth Amendment is a substantive prohibition on certain conduct, due process merely requires (as the name suggests) certain procedural safeguards. Thus, as noted earlier, to say the prison was not required to hold a hearing before imposing the BMP is not the same as saying the BMP was not cruel and unusual; to use a crude example, a prison guard need not hold a hearing before beating an inmate, but that does not mean the beating will withstand Eighth Amendment review.

Although the two analyses are logically quite different, in a case like this they will often involve the same facts and the same conclusions. Initially, the defendants argue at some length that Gillis should not be allowed to "engineer" his own constitutional claim: he knew he would be punished for violating a rule, yet he violated the rule anyway. There is some merit in the defendants' argument. In *Rodriguez v. Briley,* for example, the Seventh Circuit concluded that the plaintiff, who had failed to follow a legitimate prison rule, could not be heard to complain when his violation of the rule resulted in his punishment. 403 F.3d 952, 953 (7th Cir. 2005). But the analogy to *Rodriguez* is not entirely apt, because what Gillis is complaining about is not the fact of his punishment but its extent; that is, even if he did "engineer" *some* punishment, the extent of the punishment he received was still too harsh. Put another way, an inmate's knowing rule violation does not give prison officials a free pass to issue any sort of punishment they want. Accordingly, it seems best to proceed to the merits of the claim, i.e., whether the conditions of the BMP violated the Eighth Amendment.

10

Largely for the reasons noted in my discussion of due process, I conclude that Gillis' punishment did not violate the Eighth Amendment.[4] Taking the facts in his favor, Gillis existed in a cool, stark cell for five days with no clothing and little else. No doubt the BMP was designed to be uncomfortable–it was, after all, punishment *in addition to* the extremely restrictive punishment Gillis was already serving. Yet even taking all the conditions in the aggregate, the cases relied on by the plaintiff do not support the conclusion that the discomfort Gillis suffered rose to the level of a constitutional violation.

First, while deprivation of hygienic items could, in the long term, offend standards of decency, the deprivation here was relatively brief: after five days Gillis was allowed showers and toothpaste, as well as a poncho-like smock. The plaintiff has offered no cases in which these relatively minor and brief deprivations resulted in a finding of a constitutional violation. As to the cold Gillis experienced, the cases he cites bear little similarity to the conditions Gillis endured. In one case he cites, for example, the court described the situation as follows:

> Frigid weather descended upon northern Illinois from January 8th through January 11th of 1982. The sub-zero temperatures recorded dropped to twenty-two degrees below zero with a corresponding wind chill factor of eighty degrees below zero. During these abnormally cold days, many areas in the Stateville Correctional Center experienced colder than usual temperatures. But in Cellhouse B-West, the heating system malfunctioned and the inside temperatures there fell and remained below freezing. Broken windows in the cell block permitted the frigid outside air to flow in, ice formed in the cells, and "it was cold enough to see your breath."

---

[4] In my March 31 Order, I stated that Gillis' complaints "implicate" the protections of the Eighth Amendment, and the plaintiff now construes this as a legal conclusion that they *violate* the Eighth Amendment. (March 31 Order at 25.) That was not my intent. Instead, I simply concluded that if Gillis' portrayal of events were true, they *could* state an Eighth Amendment claim, and thus I deemed summary judgment improper at that time.

11

*Henderson v. DeRobertis,* 940 F.2d 1055, 1057-58 (7th Cir. 1991). Here, in contrast, Gillis' cell was kept in the low or mid-70's. No doubt his lack of clothing made conditions chilly, especially before he was issued a smock, but that level of discomfort does not rise to the level of a constitutional violation. *Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir. 1988)(noting that "considerable unpleasantness" does not amount to an Eighth Amendment violation).

It is true that the plaintiff prefers to group together all of his hardships, but even so they do not create the impression of an Eighth Amendment violation. Seventy-one degrees is warmer than many private homes are kept during the winter; though Gillis' nakedness for five days no doubt made conditions more uncomfortable, I cannot conclude that they were offensive to the standards of decency that the Eighth Amendment is intended to protect. Accordingly, the defendants' motion for summary judgment is granted on the Eighth Amendment claim.

## II. CONCLUSION

For the reasons given above, the plaintiff's motion for summary judgment is denied, and the defendants' motion is granted. The case is dismissed.[5]

Dated this   13th   day of March, 2006.

                        s/ William C. Griesbach
                        William C. Griesbach
                        United States District Judge

---

[5] Appointed counsel for plaintiff is thanked for their extremely competent representation of the plaintiff.